Gary A. Hecker, Esq. (State Bar No. 99008)
James M. Slominski, Esq. (State Bar No. 166357)
**THE HECKER LAW GROUP**
1925 Century Park East, Suite 2300
Los Angeles, California 90067
Telephone:  (310) 286-0377
Facsimile:  (310) 286-0488
Email:    ghecker@heckerlaw.com
          jslominski@heckerlaw.com

Attorneys for Plaintiff
The Hecker Law Group, PLC

# IN THE UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| THE HECKER LAW GROUP, a Professional Law Corporation,<br><br>Plaintiff,<br><br>v.<br><br>JAMES BOOTH, an individual; and DOES 1-5,<br><br>Defendants. | Civil Action No.<br><br>**COMPLAINT FOR:**<br><br>**(1) DECLARATORY JUDGMENT;**<br>**(2) BREACH OF CONTRACT;**<br>**(3) INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE;**<br>**(4) FRAUD;**<br>**(5) BREACH OF FIDUCIARY DUTY;**<br>**(6) UNLAWFUL, UNFAIR, AND FRAUDULENT BUSINESS PRACTICES IN VIOLATION OF CAL. BUS. & PROF. CODE §17200**<br><br>**DEMAND FOR JURY TRIAL** |

**COMPLAINT**

Plaintiff, The Hecker Law Group, PLC (hereinafter "HLG") alleges upon information and belief as follows:

## THE PARTIES

1. Plaintiff, HLG, is a professional law corporation organized and existing under the laws of the State of California and having a principal place of business at 1925 Century Park East, Suite 2300, Los Angeles, California. HLG is, and was at all times mentioned herein, in good standing and qualified to do business in the State of California.

2. Defendant James Booth (hereinafter "Booth") is and was at all times mentioned herein a foreign citizen residing in Manila, Philippines, and doing business in the County of Los Angeles, State of California and has stipulated to personal jurisdiction and venue in this judicial district.

## JURISDICTION

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 2201-2202, the Declaratory Judgment Act, and 28 U.S.C. § 1332(a), Diversity Jurisdiction, given the diverse citizenship of the parties and an amount in controversy exceeding $75,000.00.

4. This Court has supplemental subject matter jurisdiction over the related state claims for breach of contract, intentional interference with prospective economic advantage, fraud, breach of fiduciary duty, and unlawful, unfair and fraudulent competition under California Business & Professions Code § 17200 et seq., given the substantial overlap of common relevant facts under 28 U.S.C. § 1367.

5. Venue for this action is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(b) and (c).

## FACTUAL BACKGROUND

6. HLG is an intellectual property law firm located in Los Angeles, California.

7. At all relevant times herein, HLG was the owner of the domain name hh.com ("HH.com", "the HH.com Domain Name", or "Domain Name").

8. HH.com is a two letter ".com" domain name with repeating consonants.

9. Repeating two letter .com domain names are rare. There are only twenty-six two-letter .com domain names with repeating letters (namely, aa.com, bb.com, …, zz.com) and only twenty-one two-letter .com domain names with repeating consonants.

10. Because HH.com is a two letter, repeating consonant .com domain name, it is uniquely valuable.

11. In or about October 2010, Defendant Booth began sending unsolicited emails and making unsolicited telephone calls to HLG. In those emails and calls, Booth held himself out as having special expertise in procuring and facilitating domain name sales. Booth attempted to convince HLG to sell the HH.com Domain Name and to hire Booth as HLG's exclusive domain name broker for that purpose.

12. To induce HLG to hire Booth to sell the HH.com Domain Name, Booth represented to HLG that: (1) Booth could easily arrange a sale of the Domain Name at a price exceeding four million dollars and (2) any broker fee for the transaction would be paid by the **buyer** (and not HLG) over and above the sale price.

13. On October 25, 2016, Booth emailed HLG's President, Gary Hecker, stating: *"I have spoken with my partner Andy and we both agree that 4m+ is achievable for you. If you are happy to give me 90 days exclusive on the name I will certainly get you results"*.

14. Through the remainder of 2016, Booth persisted in his efforts to induce HLG to enter into a 90-day exclusive broker agreement for Booth to broker the sale of the valuable HH.com Domain Name.

15. No agreement, however, was reached or entered into in 2016. Further, at no time during 2016 was Booth contracted, permitted or otherwise authorized in any way, to act on HLG's behalf for the sale of HH.com.

16. Despite that fact, beginning at least as early as November 2016, Booth began to intentionally misrepresent to the public, including to other domain name brokers, that Booth was the exclusive broker for the sale of the HH.com Domain Name, when in fact, he was not.

17. On or about November 11, 2016, Booth participated in a promotional interview published on the World Wide Web in which Booth falsely claimed that he was the exclusive broker of the HH.com Domain Name, knowing that claim was completely false.

18. During Booth's interview, published in the online blog "Domaingang" which covers the domain business, Booth misrepresented that: ***"I have also been lucky enough to obtain HH.com on an exclusive…"*** when, in fact, Booth had no right whatsoever, exclusive or otherwise, to broker the HH.com Domain Name.

19. Booth also used the name of HLG's president in advertising and promoting Booth's services as a domain name broker and in misrepresenting to the public that Booth was the exclusive broker for the HH.com Domain Name, all without HLG's knowledge, permission or consent.

20. In making such false representations, Booth, *inter alia*, intentionally sought: (1) to dissuade other domain name brokers from pursuing the opportunity to market and sell the HH.com Domain Name; (2) to dissuade potential customers for the Domain Name from contacting HLG, and (3) to enhance Booth's personal reputation and cache by associating himself with the rare, high value HH.com Domain Name and its owner, all for Booth's commercial benefit and gain.

21. HLG informed Booth in writing that he was falsely representing himself as being HLG's exclusive broker when he was not, without HLG's knowledge, permission or consent, and that Booth's actions were damaging to HLG.

22. When confronted by HLG about his wrongdoing, Booth admitted that: (1) his interview with the Domaingang publication was about Booth's domain name service business for his own benefit; (2) he should not have claimed to be HLG's

exclusive broker when, in fact, he knew wasn't; and (3) he should not have used HLG's president's name and right of publicity without his knowledge, permission or consent.

23. Thereafter, Booth continued in his efforts to convince HLG to enter into a limited, 90-day, exclusive domain name broker agreement by, among other things, promising that Booth would not engage in such misconduct again in the future.

24. In reliance on Booth's representations to HLG that Booth would not engage in such misconduct again, on January 6, 2016, HLG entered into a narrow, limited domain name broker agreement with Booth having an effective date of January 5, 2016 ("Agreement"). The Agreement is attached to this Complaint as Exhibit A.

25. The Agreement expressly set forth the terms and conditions that Booth must satisfy in order to be entitled to a broker fee.

26. Among other things, the terms of the Agreement expressly required that:
   (1) Booth procure a buyer for HH.com within the 90-day term;
   (2) the sale conclude for a minimum sale price of $4.3 million;
   (3) the Broker fee be paid by the buyer over and above the $4.3 million minimum sale price; and
   (4) Booth keep all pricing information strictly confidential.

27. Booth did not procure a buyer for HH.com during the 90-day term.

28. Booth did not present any *bona fide* offers for purchase of the HH.com Domain Name to HLG during the 90-day term of the Agreement.

29. No sale of HH.com was procured for the $4.3 million minimum sale price or greater during the 90-day term of the Agreement or otherwise.

30. Booth did not keep pricing information strictly confidential.

31. Further, despite the expiration of the Agreement on April 5, 2016, Booth continued to represent to the public that he was the exclusive broker for the HH.com

Domain Name, without HLG's knowledge, permission or consent, and in violation of the express terms of the Agreement.

32. For example, on April 13, 2016, after the 90-day term of the Agreement had expired, Booth wrote to the representative of a Chinese domain name broker and falsely stated that, *"I [James Booth] am the one that holds the exclusive contract with Hecker Law Group."*

33. In addition to falsely stating that he was the exclusive broker for the HH.com Domain Name when he was not, Booth also falsely broadcast to the public, including the domain name broker community, that the HH.com Domain Name had been sold, when, in fact, it had not been sold and was actively available for sale.

34. For example, on May 25, 2016, more than a month after the 90-day term of the Agreement expired, Booth emailed a domain name broker he believed was seeking to broker the sale of the HH.com Domain Name.

35. In that email, Booth once again falsely represented himself as the exclusive broker of the HH.com Domain Name. Booth used that representation in a calculated effort to intimidate, impede and prevent that domain name broker from acting on HLG's behalf to sell HH.com, all under false pretenses. Thus, Booth wrote to that broker: *"I have been informed that you have been trying to sell the domain name hh.com. HH.com is under the exclusive contract with Booth.com. Please can you inform me who gave you permission to sell the HH.com?"*

36. Booth also engaged in other purposeful acts designed and intended to interfere, undermine and foreclose the contractual business relations of HLG with other domain name brokers and purchasers.

37. For example, as further part of Booth's egregious, purposeful effort to interfere with the prospective economic advantage of HLG, Booth falsely announced to the public that the HH.com Domain Name had been sold, when, in fact, it had not been sold.

38. Further, Booth used online messaging to impede and prevent third party domain name brokers and prospective purchasers from procuring and facilitating a sale of the HH.com Domain Name by propagating false information about the status of the HH.com Domain Name.

39. For example, in May 2017, Booth broadcast that the HH.com Domain Name was sold, and published that false information stating:

> *"We have a few recent sales.... HH.com - SOLD."*

40. Booth's self-promotional and interferential broadcast, however, was wholly fabricated and completely false – again misrepresenting that the HH.com Domain Name was sold and that Booth had sold it.

41. Further, in 2017, without HLG's knowledge, permission or consent, and while the HH.com Domain Name was being actively marketed by another broker, Booth falsely advertised, listed, and promoted the HH.com Domain Name for sale, when Booth was not authorized as a broker or agent of HLG and at a time when Booth had no authorized involvement with HLG or the HH.com Domain Name whatsoever.

42. Shockingly, Booth posted the HH.com Domain Name for sale at a fictitious "offer price" that was more than seven figures lower than the actual offer price. As a result of Booth's shocking, fraudulent offer for sale of the HH.com Domain Name at a falsely low sale price, Booth made it virtually impossible for HLG to procure or negotiate with prospective buyers at any price exceeding the falsely advertised sale price posted and published by Booth. Booth's false offer also violated the confidentiality provision of the Agreement.

43. Booth also made disparaging remarks to brokers and others about HLG's President as part of his effort to dissuade others from seeking to do business or doing business with HLG, and to interfere with the prospective sale of the Domain Name by others, all for Booths personal gain and economic advantage.

44. Booth ignored demands by HLG that Booth cease and desist his fraudulent and wrongful conduct and cease his unauthorized activities and

involvement regarding HH.com. Booth failed to cease and desist and responded to HLG's demands in a defamatory manner.

45. HLG ultimately sold the HH.com Domain Name in the Spring of 2017, more than a year following the expiration of the Agreement.

On April 7, 2017, a lawyer from a law firm named "Revision Legal" sent a letter entitled "Breach of Brokerage Agreement" to HLG on behalf of James Booth: (1) asserting that HLG breached the Agreement, (2) asserting that HLG owes Booth a fee of 10% of the sale price of the HH.com Domain Name (expressly stating, ***"You owe my client 10% of the purchase price"***, which is an amount exceeding $75,000.00), (3) claiming that the amount Booth asserts is owed by HLG is owed pursuant to the terms of the Agreement, and (4) threatening to proceed with litigation if HLG does not accede to Booth's demand for payment in an amount exceeding $75,000.00.

46. HLG has disputed, and continues to dispute, Booth's assertions, claims and demands.

47. HLG has disputed, and continues to dispute, that it owes Booth 10% of the sale price of the HH.com Domain Name, or any amount whatsoever under the terms of the Agreement or otherwise.

48. As further set forth herein, HLG contends that Booth has breached the Agreement and has engaged in other unlawful conduct causing damage to HLG.

49. As of the date of the filing of this action, Booth continues to maintain his assertions, claims and demands set forth in the letter dated April 7, 2017 sent to HLG by Booth's lawyer.

50. As a result of Booth's unlawful acts, HLG has suffered damages in an amount exceeding $75,000.00, and there is an actual, present, and justiciable controversy in view of Booth's claim of breach of the Agreement, demand for payment, and threat of litigation against HLG.

## FIRST CAUSE OF ACTION
## DECLARATORY JUDGMENT

51. HLG incorporates by reference paragraphs 1 – 50 above as though fully set forth herein.

52. An actual, present, and justiciable controversy has arisen and now exists between HLG and Booth concerning their respective rights, duties, and obligations under the Agreement.

53. HLG contends that Booth is not entitled to any commission, fee, or consideration whatsoever relating to the sale of the Domain Name. HLG further contends that the Agreement is null and void because Booth knowingly made material misrepresentations to HLG to induce HLG to enter into the Agreement.

54. Booth disputes this and contends that he is owed a commission under the terms of the Agreement in an amount exceeding $75,000.00.

55. Given the dispute between parties relating to the sale of the Domain Name and any alleged commission owed to Booth relating thereto, HLG now seeks, and alleges it is entitled to, a declaration and corresponding judgment from this Court pursuant to 28 U.S.C. §§ 2201-2202 that HLG is not obligated or liable to Booth for any claimed commission and that the Agreement is null and void because it was procured by fraud.

## SECOND CAUSE OF ACTION
## BREACH OF CONTRACT

56. HLG incorporates by reference paragraphs 1 – 50 above as though fully set forth herein.

57. Booth and HLG entered into a written Agreement.

58. HLG performed all of its obligations, covenants and conditions required of it under pursuant to the terms of the Agreement, except to the extent that such obligations, covenants and conditions have been excused, prevented, or waived by Booth's acts and omissions.

59.     Booth breached the Agreement and breached the implied covenant of good faith and fair dealing therein by, *inter alia,* doing the acts alleged herein, failing to keep all pricing information relating to HH.com confidential, failing to take all necessary steps to successfully effectuate and conclude a sale of the Domain Name, and failing to reasonably cooperate with third party brokers who had, or may have had, prospective buyers for the Domain Name.

60.     As a result of Booth's breach of contract, HLG was unable to obtain a sale price for the Domain Name that it otherwise would have obtained in the absence of Booth's breach, thereby suffering damages in a sum not less than one million dollars.

## THIRD CAUSE OF ACTION
## INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

61.     HLG incorporates by reference paragraphs 1 – 50 as though fully set forth herein.

62.     Prospective advantageous economic relationships existed between HLG and third parties, namely, third party brokers and prospective buyers of the Domain Name.

63.     Booth was aware of these prospective economic relationships.

64.     Booth intentionally interfered with these prospective economic relationships by engaging in conduct that was independently wrongful, fraudulent, and in violation of California Business & Professions Code § 17200, et seq. Booth's wrongful conduct included, among other things, intentionally: (1) publicizing a false sales price for the Domain Name, (2) publicizing that Booth was the exclusive broker for the Domain Name when he was not, (3) publicizing that the Domain Name was sold when it was not, and (4) publicizing that a sale of the Domain Name was pending when it was not.

65. As a direct result of Booth's interference, both the actual and prospective economic relationships between HLG and third-party brokers and prospective buyers of the Domain Name were harmed, and proximately and actually caused HLG to suffer damages in an amount in excess of one million dollars.

66. Further, Booth's wrongful actions were done deliberately and with malice, fraud, and oppression, thereby entitling HLG to and award of punitive damages against Booth.

## FOURTH CAUSE OF ACTION

## FRAUD

67. HLG incorporates by reference paragraphs 1 – 50 as though fully set forth herein.

68. As alleged in paragraphs 17 through 26 of this Complaint, to induce HLG to enter into the Agreement with Booth, Booth promised that he would never again engage in certain misconduct including, but not limited to: (1) falsely representing that he was the exclusive broker for the Domain Name when he was not, and (2) publishing or otherwise disseminating false and/or unauthorized information about the Domain Name.

69. In fact, Booth knew at the time he made those representations that they were false and Booth intended that HLG rely on those misrepresentations to induce HLG to enter into the Agreement.

70. HLG justifiably relied on Booth's representations as being honest and forthcoming.

71. HLG would not have entered into the Agreement had HLG known that Booth's representations were false.

72. As a direct and proximate result of Booth's fraud, HLG has suffered damages in an amount in excess of one million dollars.

73. Further, Booth's actions were done deliberately and with malice, fraud, and oppression thereby entitling HLG to an award of punitive damages against Booth.

## FIFTH CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY

74. HLG incorporates by reference paragraphs 1 – 50 as though fully set forth herein.

75. As a result of the broker-seller relationship with Booth, HLG placed substantial trust and confidence in Booth, and Booth owed HLG fiduciary duties, including, among other things: (1) a duty to deal fairly and honestly with HLG, (2) a duty to disclose to HLG material facts and terms that were adverse to its interests, (3) a duty to disclose to HLG Booth's conflicts of interest, (4) duties of care, loyalty, skill, competence, and good faith, and (5) a duty to refrain from self-dealing.

76. Booth breached those fiduciary duties to HLG by, among other things, engaging in the conduct as alleged above in this Complaint.

77. As a direct and proximate result of Booth's breaches of fiduciary duty, HLG has incurred damages in excess of one million dollars.

78. Booth's breaches of his fiduciary duty were fraudulent, oppressive, willful, and malicious, thereby entitling HLG to an award of punitive damages against Booth.

## SIXTH CAUSE OF ACTION

## VIOLATIONS OF CAL. BUS. & PROF. CODE § 17200

79. HLG incorporates by reference paragraphs 1 – 50 as though fully set forth herein.

80. Section 17200 of the California Business & Professions Code ("Unfair Competition Law" or "UCL") prohibits any "unlawful", "unfair", and "fraudulent" business practice.

81. The acts and conduct of Booth as alleged above in this Complaint constitute unlawful, unfair, and fraudulent business acts and/or practices as defined by the UCL. Booth's misconduct includes, *inter alia*: (1) falsely representing to the public that he was the exclusive broker for the Domain Name when in fact he was not,

(2) falsely representing to the public that the Domain Name was sold when in fact it was not, (3) falsely representing purchase prices for the Domain Name without HLG's knowledge, approval, or consent, (4) publishing unauthorized false pricing for the Domain Name, and (5) disparaging HLG's President to others.

82. Section 17200 also prohibits any "unfair, deceptive, untrue or misleading advertising." For the reasons set forth above, Booth engaged in unfair, deceptive, untrue, and misleading advertising in violation of Section 17200.

83. Booth's unlawful, unfair and fraudulent conduct caused HLG to lose money in amount in excess of one million dollars.

## PRAYER FOR RELIEF

**WHEREFORE**, HLG requests that the court enter judgment in its favor as follows:

1. Issue a declaratory judgment declaring that HLG is not liable to Booth for any claimed broker fees, commissions, or consideration whatsoever;

2. Issue an award of:
   a. Compensatory damages against Booth in amount of at least one million dollars;
   b. Punitive damages;
   c. Reasonable attorneys' fees and costs to the extent permitted by law;
   d. Grant such other relief that is determined to be just and proper.

Respectfully submitted,

DATED: June 19, 2017        **THE HECKER LAW GROUP**

By: /s/ James M. Slominski

James M. Slominski
Attorneys for Plaintiff

12
**COMPLAINT**

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff hereby demands a jury trial on all issues and causes of action triable to a jury.

Respectfully submitted,

DATED: June 19, 2017      **THE HECKER LAW GROUP**

By: /s/ James M. Slominski

James M. Slominski
Attorneys for Plaintiff